Acevedo v Citibank, N.A. (2024 NY Slip Op 24091)

[*1]

Acevedo v Citibank, N.A.

2024 NY Slip Op 24091

Decided on March 25, 2024

Supreme Court, Bronx County

Hummel, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and subject to revision before publication in the printed Official Reports.

Decided on March 25, 2024
Supreme Court, Bronx County

Celinda Acevedo and Angelica Acevedo, individually and on behalf of all other similarly situated, Petitioners,

against
Citibank, N.A., Respondent.

Index No. 802892/2021E

Plaintiff's attorney
Daniel f. Schreck, Esq.
Law offices of G. Oliver Koppell & Associates,
212-867-3838
Defendants
Yoa M. Griver, Esq.
Zeichner Ellman & Krause, LLP
730 Third Avenue, 
New York, NY 10017
212-223-0400

Veronica G. Hummel, J.

In accordance with CPLR 2219(a), the decision herein is made upon consideration of all papers filed by the parties in NYSCEF in connection with: (1) petitioners CELINDA ACEVEDO's ("C. Acevedo") and ANGELICA ACEVEDO's ("A. Acevedo"; and, together with C. Acevedo, "Petitioners") motion (Seq. No. 1) seeking an order certifying proposed classes, finding that respondent CITIBANK, N.A. ("Citibank") violated the Exempt Income Protection Act, and awarding Petitioners and the certified class members damages and injunctive relief; and (2) Citibank's motion (Seq. No. 2) seeking an order, pursuant to CPLR § 7503, compelling arbitration of the dispute between Petitioners and Citibank.
Oral argument on the motions was held before the Court virtually via Microsoft Teams on October 24, 2023.
I. Introduction
Citibank's motion raises a matter of apparent first impression: whether a judgment-debtor's claims against a bank, pursuant to CPLR §§ 5239 and 5240, for violations of the Exempt Income Protection Act (the "EIPA"), 2008 NY Sess. Laws ch. 575, may be arbitrated pursuant to written agreement.
Through the EIPA, the New York Legislature sought to curtail improper pre-execution restraint of exempt judgment-debtor funds held by banks. It did so by creating a notice-and-claim procedure, as well as by establishing certain minimum amounts of funds held in a judgment-debtor's bank account that are automatically exempt from restraint by a judgment-creditor's restraining notice.
Petitioners maintained banking accounts with Citibank. Funds held in those accounts were allegedly restrained by Citibank, after it received restraining notices from judgment-creditors, in violation of the EIPA. Specifically, Petitioners allege that Citibank improperly restrained funds statutorily exempt from restraint, aggregated funds held across Petitioners' multiple accounts in applying the statutory threshold for automatic exemption from restraint, improperly charged Petitioners fees associated with implementing the restraints, and improperly prevented Petitioners from normal banking access to exempt funds by only permitting withdrawal in person at branch locations.
Citibank, however, claims that whether its actions violated the EIPA is a matter to be resolved in arbitration. Citibank points to written arbitration agreements to which Petitioners allegedly agreed when they opened their accounts and argues that this dispute falls within the scope of those agreements.
Petitioners do not dispute that they are subject to arbitration agreements between them and Citibank. Nor do they dispute that their claims fall within the scope of those agreements. Instead, Petitioners argue principally that arbitration of EIPA claims like theirs is barred by the New York Court of Appeals' decision in Cruz v. TD Bank, N.A., 22 NY3d 61 (2013), and the statutory judgment-enforcement regime set forth in CPLR Article 52. Petitioners also contend that the arbitration agreements are unconscionable.
Cruz, however, does not support Petitioners' position here. Contrary to Petitioners' contentions, that decision did not intend to preclude arbitration by deciding that an Article 52 special proceeding is the "exclusive" means of relief for a judgment-debtor seeking redress against a bank for violations of the EIPA. To so interpret Cruz would be to ignore the context in which that decision was rendered: in response to certified questions asking whether a private right of action for judgment-debtors could be implied in the EIPA and whether a judgment-debtor could seek relief against a bank for EIPA violations via an Article 52 special proceeding and, if so, whether the judgment-debtor could also seek relief in a plenary action. Thus, Cruz concerned only the alternatives of an Article 52 special proceeding and a plenary action, not whether arbitration of a judgment-debtor's EIPA claims against a bank was unavailable.
Petitioners' other arguments concerning Cruz are also meritless. Simply because a judgment-creditor could not be joined to an arbitration between a judgment-debtor and a bank because the creditor is not a party to the arbitration agreement, does not mean that the judgment-debtor's EIPA claims become entirely nonarbitrable. Rather, it means only that the debtor's claims against the creditor concerning any funds transferred in violation of the EIPA must be [*2]separately litigated in a special proceeding. Likewise, arbitration offers benefits similar to a special proceeding in terms of speed and complexity, and a subsequent special proceeding pursuant to CPLR Article 75 to confirm any arbitration award is not the kind of back-end litigation that the Court of Appeals found that the Legislature had sought to avoid by declining to create a private right of action in the EIPA.
Petitioners also advance a number of arguments as to why their claims are nonarbitrable based on the text and "practical application" of Article 52, but each of those arguments is also meritless. Petitioners' reliance on the Legislature's use of the term "court" throughout Article 52 is misplaced. The U.S. Supreme Court has, in fact, rejected the contention that the use of such language in a statute alone evidences the legislature's intent to preclude arbitration of a claim pursuant to that statute. Here, there is no indication that the Legislature sought to create a nonwaivable right to adjudication of EIPA disputes in a court by use of the term "court" in CPLR §§ 5222-a, 5239, and 5240.
Further, the potential unavailability in arbitration of certain remedies provided by CPLR §§ 5239 and 5240—remedies that Petitioners do not even seek in this proceeding—does not militate against the arbitrability specifically of claims, like Petitioners', in which a judgment-debtors seeks damages for EIPA violations and limited related injunctive relief. The applicable arbitration agreements, as well as the rules of the arbitral forums selected in those agreements, grant an arbitrator sufficient power to award Petitioners their requested relief, to the extent such relief is authorized under Cruz.
Moreover, the venue provision in CPLR § 5239 becomes inapplicable when a party waives initial adjudication of an EIPA claim in a court in favor of adjudication in arbitration, as Petitioners have done here. And the fact that CPLR § 5239 allows even third parties, who may not be subject to an arbitration agreement, to commence a special proceeding to determine their rights in property or debt again means only that any such disputes not subject to an arbitration agreement must be maintained in court, not that the statue entirely bars arbitration of any and all EIPA claims.
Finally, as to the unconscionability of the applicable arbitration agreements, that claim must be resolved by an arbitrator. This is because the arbitration agreements contain a delegation provision that Petitioners fail to specifically challenge. Wu v. Uber Techs., Inc., 219 AD3d 1208, 1209 (1st Dep't 2023).
For these reasons, the Court finds that Petitioners' claims under the EIPA are arbitrable, that Petitioners agreed to arbitrate their claims, and that Petitioners' arguments concerning the unconscionability of the arbitration agreements must be resolved by the arbitrator, not this Court. Therefore, Citibank's motion to compel arbitration is GRANTED, Petitioners' motion to certify classes and find that Citibank violated the EIPA is DENIED as moot, and this proceeding is DISPOSED.
II. Background
A. Petitioners' Banking Relationship with Citibank
i. C. Acevedo
On or about March 23, 1992, C. Acevedo opened a consumer deposit savings account with Citibank. (Affidavit of Joan Haslam, sworn to on June 10, 2021 (NYSCEF Doc. 16) ("Haslam Aff."), ¶ 6) It was then "the policy and practice of Citibank that each new account holder must sign a signature card at the time they open an account." (Id. ¶ 7) At that time, Citibank would also provide an account holder with a copy of the Citibank Deposit [*3]Agreement—entitled a "Customer Manual"—in effect when the account holder signed the signature card. (See id.) Although Citibank is unable to locate C. Acevedo's signature card signed in connection with the opening of her savings account, C. Acevedo does not deny having executed it or having received the Customer Manual in effect at the time. (Id. ¶ 6; see generally Petitioner's Memorandum of Law in Opposition to Respondent's Motion to Compel Arbitration, dated August 27, 2021 ("Pets.' Mem.") (NYSCEF Doc. 33)) The Customer Manual, effective February 1992, does not contain an arbitration provision.
A new Customer Manual—now called a "Client Manual"—took effect on February 15, 2009 (the "2009 Client Manual").[FN1]
(Haslam Aff. Ex. B (NYSCEF Doc. 18)) The 2009 Client Manual is 28 total pages, including cover page and table of contents, with each individual page containing two numbered pages arranged in side-by-side vertical columns of text. An arbitration provision begins on the 39th numbered page of the document. The arbitration provision provides, in relevant part:
. . . EITHER YOU OR WE CAN REQUIRE THAT ANY DISPUTES BE RESOLVED BY BINDING ARBITRATION. ARBITRATION REPLACES THE RIGHT TO GO TO COURT, INCLUDING THE RIGHT TO PARTICIPATE IN A CLASS ACTION OR SIMILAR PROCEEDING. . . .
Agreement to Arbitrate Disputes. Either you or we may elect, without the other's consent, to require that any dispute between us, or concerning your Citibank deposit, Ready Credit®, Checking Plus® or Checking Plus® (variable rate) accounts, except those disputes specifically excluded below, be resolved by binding arbitration.
Disputes Covered by Arbitration. Any claim or dispute relating to or arising out of your deposit Ready Credit®, Checking Plus® or Checking Plus® (variable rate) account, this Agreement, or our relationship will be subject to arbitration. All disputes are subject to arbitration, no matter what legal theory they are based on or what remedy (damages, or injunctive or declaratory relief) they seek. Disputes include any unresolved claims concerning any services relating to such account . . . . Disputes include claims based on any theory of law, contract, statute, regulation, tort (including fraud or any intentional tort), or any other legal or equitable ground . . . . Disputes include claims made as part of a class action or other representative action, it being expressly understood and agreed to that the arbitration of such claims must proceed on an individual (non-class, non-representative) basis. Disputes also include claims relating to the enforceability or interpretation of any of these arbitration provisions. Any questions about whether disputes are subject to arbitration shall be resolved by interpreting this arbitration provision in the broadest way the law will allow it to be enforced.
. . . .
Commencing an Arbitration. The party filling an arbitration must choose one of the following neutral arbitration forums and follow its rules and procedures for initiating and pursuing an arbitration: American Arbitration Association or National Arbitration Forum. . . .
Administration of Arbitration. The arbitration shall be decided by a single, neutral arbitrator. . . . The arbitrator shall follow procedures and rules of the arbitration forum in effect on the date the arbitration is filed unless those rules and procedures are inconsistent with this arbitration provision, in which case this arbitration provision will prevail. . . . The arbitrator shall decide the dispute in accordance with applicable substantive law consistent with the Federal Arbitration Act and applicable statutes of limitations . . . and will be empowered to award any damages or other relief provided for under applicable law. . . .
No Class Action or Joinder of Parties. You and we agree that no class action, private attorney general or other representative claims may be pursued in arbitration, nor may such action be pursued in court if either you or we elect arbitration. Unless mutually agreed to by you and us, claims of two or more persons may not be joined, consolidated, or otherwise brought together in the same arbitration . . . .
. . . .
Governing Law. You and we agree that our relationship includes transactions involving interstate commerce and that these arbitration provisions are governed by, and enforceable under, the Federal Arbitration Act. To the extent that state law is applicable, the laws of the state governing your account relationship apply.
(Id. at 39-41)
On April 13, 2015, C. Acevedo closed her Citibank savings account and opened a Citibank Basic Banking account. (Haslam Aff. ¶ 11) At that time, she signed a new signature card, which provides:
By signing below, I: (1) agree to be bound by all Citibank, N.A. terms and conditions applicable to my account(s), including the Client Manual Consumer Accounts . . . ; (2) understand and acknowledge that such note(s)/agreement(s) provide that any dispute between us will be resolved by binding arbitration; and (3) . . . such arbitration provisions apply to all my other Citibank deposit, Custom Credit Line, Ready Credit, Secured Ready Credit, Checking Plus (variable rate) or Checking Plus accounts.
(Id. Ex. C (NYSCEF Doc. 19))
When she signed her signature card, C. Acevedo would also have received the Client Manual effective January 20, 2015 (the "2015 Client Manual"). (Id. ¶ 11) C. Acevedo does not deny having received the manual at that time. (See generally Pets.' Mem.) The 2015 Client Manual is 56 total pages, including cover page and table of contents. (Haslam Aff. Ex. D (NYSCEF Doc. 20)) Unlike the 2009 Client Manual, the 2015 Client Manual has only one numbered page per actual page of the document. Like the 2009 Client Manual, however, the 2015 Client Manual also contains an arbitration provision, beginning on page 52. With few exceptions, only one of which is relevant here, the arbitration provision contained in the 2015 Client Manual is structurally and substantively identical to the arbitration provision contained in the 2009 Client Manual. (Compare id. at 52-54, with id. Ex. B at 39-41) The one relevant exception is that the National Arbitration Forum ("NAF")[FN2]
has been replaced by JAMS as an [*4]agreed-upon arbitration provider. (Compare id. Ex. D. at 53, with id. Ex. B at 40) In addition to the arbitration provision, and unlike the 2009 Client Manual, the 2015 Client Manual includes a reference to arbitration on its cover page, stating there that "This manual also contains an agreement to arbitrate all disputes between us by private arbitration." (Id. Ex. D at 1)
ii. A. Acevedo
On January 31, 2000, A. Acevedo opened a consumer checking account with Citibank. (Haslam Aff. ¶ 13; id. Ex. E (NYSCEF Doc. 21))
Seven years later, on January 24, 2007, A. Acevedo opened an IRA account with Citibank. (Id. ¶ 14) In connection with opening the IRA account, A. Acevedo executed an application (the "IRA Application") and received a copy of the Citibank Traditional IRA Plan Documents (the "IRA Plan Documents").
Immediately above A. Acevedo's signature on the IRA Application, the document provides: "By signing this form you acknowledge that: You have read the Citibank IRA or Roth IRA Trust Agreement and Disclosure Statement. . . . You accept the term[s] of the applicable Citibank IRA or Roth IRA Trust Agreement . . . ." (Id. ¶ 15; id. Ex. F (NYSCEF Doc. 22) at p. 2) And, immediately above and to the right of A. Acevedo's signature, set off from the surrounding text in a text box and bold-face font, the IRA Application provides:
Arbitration for traditional IRA or Roth IRA Brokerage Account: You are aware that the Citibank IRA or Roth IRA Brokerage Account Customer Agreement contains a Pre-Disputed Arbitration Clause on page 4, Section 8 of the traditional IRA and Roth IRA Plan Documents. You acknowledge receipt of the Pre-Dispute Arbitration Clause and that your traditional IRA or Roth IRA Brokerage Account is covered by these terms.
(Id. ¶ 15; id. Ex. F at p. 2)
The IRA Plan Documents contain multiple independent documents that are a combined 40 pages in length. (See id. Ex. G (NYSCEF Doc. 23)) Part 4 of the first document, beginning on its 5th page, is an arbitration provision. This provision is virtually identical to the arbitration provisions contained in the 2009 and 2015 Client Manuals, with the only relevant differences being that this provision refers to an IRA account rather than a Citibank deposit, Ready Credit®, Checking Plus®, or Checking Plus® (variable rate) account and substitutes JAMS for NAF as an agreed-upon arbitration provider. (Compare id. at pp. 6-8, with id. Ex. B at 39-41, and id. Ex. D at 52-54)
A new Client Manual took effect on June 1, 2017 (the "2017 Client Manual"). (Id. Ex. H (NYSCEF Doc. 24)) The 2017 Client Manual is 29 total pages, including cover page and table of contents, with each individual page containing two numbered pages arranged in side-by-side vertical columns of text. Like the 2015 Client Manual, the 2017 Client Manual contains the same reference to arbitration on its cover page. (Id. at 1) And like the 2015 Client Manual, the 2017 Client Manual contains an arbitration provision beginning on its 52nd numbered page. Once again, this arbitration provision is virtually identical to the arbitration provisions contained in the 2009 and 2015 Client Manuals, with the relevant exception that NAF is once again replaced by JAMS. (Compare id. at 52-55, with id. Ex. B at 39-41, and id. Ex. D at 52-54) One other notable exception is the addition of a clause permitting an account holder to reject the resolution of disputes by arbitration by sending a written opt-out notice to Citibank within 30 days of account opening. (Id. Ex. H at 55) There is no evidence in the record, however, that A. Acevedo ever sent such a notice to Citibank.
B. The Exempt Income Protection Act
The EIPA was signed into law in 2008. In Cruz, 22 NY3d 61, the Court of Appeals provided a comprehensive overview of the EIPA's purpose and key terms. As to its purpose, the Court of Appeals wrote:
Under both federal and state law, certain types of funds are exempt from restraint or execution, including Social Security benefits, public assistance, unemployment insurance, pension payments and the like. Although the clear legislative intent is that funds of this nature are not to be subject to debt collection (and therefore excluded from any pre-execution restraint), prior to 2008 banks served with restraining notices often inadvertently froze accounts containing income from these sources, leaving judgment debtors without access to much-needed exempt monies.
The EIPA was intended to ameliorate this problem, amending certain existing statutes in CPLR article 52 and adding new CPLR 5222-a.
Cruz, 22 NY3d at 66.
CPLR Article 52 "sets forth procedures for the enforcement of money judgments in New York, which may include the imposition of a restraining notice against a judgment debtor's bank account to secure funds for later transfer to the judgment creditor through a sheriff's execution or turnover proceeding." Id. The EIPA's amendments to Article 52 "restricted the scope of the restraint that can be implemented against the bank account of a natural person and created a new procedure aimed at ensuring that this class of judgment debtors is able to retain access to exempt funds." Id.
As to the scope of a restraint that may be imposed against a judgment-debtor's bank account,
the EIPA precludes a bank from restraining baseline minimum balances in a "natural person's" account absent a court order. Specifically, $2,500 is free from restraint "if direct deposit or electronic payments reasonably identifiable as statutorily exempt payments . . . were made to the judgment debtor's account during the forty-five [45] day period preceding" the restraint. Otherwise, the statute excludes from restraint an amount that corresponds to 90% of 60-days wages under the federal or state minimum wage laws, whichever is greater, to be periodically adjusted—$1,740 as of July 2009.
Id. (quoting CPLR § 5222(h)) (citing CPLR § 5222(i)).
The notice-and-claim procedure that the EIPA implemented applies to both judgment-creditors and banks. "A judgment creditor restraining a bank account (in anticipation of a sheriff's execution by levy or court-ordered transfer of assets) must serve the bank with specific forms: two copies of the restraining notice, an exemption notice and two exemption claim forms." Id. at 67 (citing CPLR § 5222-a(b)(1)). "The restraint is void if the judgment creditor fails to provide these documents to the bank; in that event, the bank 'shall not restrain the account,' nor can the bank charge fees associated with a restraint." Id. (quoting CPLR § 5222-a(b)(1)) (citing CPLR § 5222(j)).
"CPLR 5222-a also imposes a new obligation on financial institutions because it compels banks to mail to judgment debtors (the account holders) copies of the exemption claim forms received from judgment creditors." Id. (citing CPLR § 5222-a(b)).
The notice advises the judgment debtor that the bank account is being restrained, describes the categories of funds that are exempt from restraint, and provides information concerning how to seek vacatur of the money judgment to avoid a subsequent transfer of the funds to the judgment creditor. The exemption claim form lists specific income [*5]sources that are not subject to restraint or execution (such as Social Security benefits, unemployment insurance, child support, veteran's benefits, etc.) and directs the debtor to check the box next to any applicable exempt funds that have been deposited in the account. The debtor is then advised to return one copy of the claim form to the bank and the other to the creditor (or its representative) within 20 days. If 25 days have elapsed and the bank has not received an exemption claim form from the judgment debtor, all funds in the account in excess of the applicable statutory minimum remain subject to the restraining notice. However, a failure to return the claim form may not be interpreted as a waiver of any exemption the judgment debtor may possess.
Upon receipt of an exemption claim form from the account holder, the bank must notify the judgment creditor "forthwith" of the exemption claim and the creditor then has eight days to object. If no objection is lodged, the restraint is lifted with respect to the disputed funds and the monies are released to the judgment debtor. To object to an exemption claim, the creditor must timely commence a special proceeding under CPLR 5240, serving papers on both the debtor and the bank before the expiration of the eight-day objection period. Within seven days of commencement of the proceeding, a hearing is to be held before a court, resulting in issuance of a judicial decision no later than five days after the hearing. In the meantime, the bank is required to hold the disputed funds for 21 days unless a court order directs otherwise; if 21 days pass and no judicial resolution of the exemption issue is forthcoming, the bank must release the disputed funds to the judgment debtor. Another subdivision [of CPLR § 5222-a] imposes special liability upon judgment creditors that object to exemption claims in bad faith.
Id. at 67-68 (citing CPLR § 5222-a(b)(4)(a), (b), -a(c)(2), (3), (5), -a(d), -a(e), -a(g), -a(h)). "The inadvertent failure by a depository institution [i.e., a bank] to provide the notice required," however, "shall not give rise to liability on the part of the depository institution." Id. at 67 (quoting CPLR § 5222-a(b)(3)).
Finally, as the Court of Appeals recognized in Cruz, "[t]he EIPA did not alter the preexisting provisions in CPLR article 52 permitting the commencement of special proceedings whereby creditors, debtors and 'any interested person' can adjudicate disputes over the ownership of income or property, nor did it restrict the power of the court to 'make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure." Id. at 68 (quoting CPLR §§ 5221, 5239, 5240).
C. Citibank's Alleged Misconduct
In their Verified Petition, Petitioners allege that their banking accounts with Citibank were restrained in violation of the EIPA. Specifically, with respect to C. Acevedo, Citibank allegedly restrained her savings account on or about June 2009 in response to the service of a restraint notice or levy by third-party creditors. (Attorney's Statement of Yoav M. Griver in Support of Motion to Compel Arbitration, dated July 23, 2021 (NYSCEF Doc. 25) ("Griver Affirm."), Ex. J ¶ 13) Citibank also charged C. Acevedo $100.00 in administrative fees for placing the restraint on her account. (Id. ¶ 14) At the time, the account contained approximately $2,000.00 from C. Acevedo's wages. (Id. ¶ 13) Citibank allegedly prevented C. Acevedo from accessing any of those funds, either in person or otherwise, even though at least $1,740.00 was exempt from restraint under the EIPA. (Id. ¶ 14)
With respect to A. Acevedo, on or about October 11, 2017, Citibank allegedly froze both her checking and IRA accounts in response to the service of a "garnishment order" by third-party [*6]creditors. (Id. ¶ 15) At the time, A. Acevedo's checking account contained approximately $788.00, and her IRA account contained approximately $4,579.01. (Id.) Citibank allegedly informed A. Acevedo that $2,724.08 of the funds contained in her accounts were segregated to be applied to the garnishment order. (Id. ¶ 16) Citibank also allegedly informed A. Acevedo that only $2,160.00 was available to her as an automatic exemption, even though at least $2,640 was exempt from restraint under the EIPA, and that A. Acevedo could only access her exempt funds by visiting a Citibank branch in person during normal business hours, and not through ATM, debit card, or check. (Id.)
Based on these allegations, Petitioners assert, on behalf of themselves as well as two proposed classes, two causes of action against Citibank. (See id. ¶¶ 42-61) The first cause of action is pursuant to CPLR § 5239 (id. ¶¶ 42-50), while the second is pursuant to CPLR § 5240 (id. ¶¶ 51-61). On the first cause of action, Petitioners seek the release of any funds restrained by Citibank allegedly in violation of the EIPA. (Id. at 14) On both the first and second causes of action, Petitioners seek a refund of any fees charged by Citibank allegedly in violation of the EIPA. (Id.) Additionally, Petitioners seek an order enjoining Citibank from (1) limiting proposed class members' access to exempt funds to in-person withdrawals; (2) aggregating all of the funds in proposed class members' accounts prior to calculating restrained and exempt funds; and (3) unlawfully turning class members' exempt funds over to judgment-creditors; and requiring (4) Citibank to return any class members' funds turned over to judgment-creditors in violation of the EIPA. (Id. at 14-15)
III. The Parties' Positions
A. The Moving, Opposition, and Reply Briefs
In its moving brief, Citibank contends that the arbitration provisions contained in the 2009, 2015, and 2017 Client Manuals and in the IRA Plan Documents (collectively, the "Arbitration Agreements") require that Petitioners' claims be arbitrated. (See Memorandum of Law of Citibank N.A. in Support of Its Motion to Compel Arbitration Under CPLR § 7503, dated July 23, 2021 (NYSCEF Doc. 28) ("Resp.'s Mem."), at 8-11) Citibank relies on the plain language of those provisions as well as New York's "strong public policy favoring arbitration." (See id. (citations omitted))
In their opposition brief, Petitioners dispute that their EIPA claims are arbitrable, despite conceding that they entered into agreements with Citibank containing the arbitration provisions in question. (See Pets.' Mem. at 2) Petitioners' overarching argument as to why their claims are not arbitrable is that arbitration of such claims would be contrary to public policy, as allegedly reflected in the Court of Appeals' decision in Cruz and in the text of the relevant statutes themselves. (See id. at 3-4)
With respect to Cruz, Petitioners rely primarily on the Court of Appeals' holding that the exclusive means of seeking relief for a bank's alleged violation of the EIPA is through a CPLR Article 52 special proceeding. (Id. at 5 (quoting Cruz, 22 NY3d at 78-78)) Petitioners reason that because special proceedings cannot be brought in arbitration, any EIPA-related claims pursuant to CPLR §§ 5239 or 5240, like Petitioners' claims herein, must be brought in a court rather than in an arbitral forum. (Id. at 5-6) Additionally, the Cruz Court noted that debtors could, if necessary, join creditors to a proceeding against a bank, and Petitioners argue that this procedural mechanism would be unavailable in arbitration because the creditor would not be a party to the arbitration agreement. (Id. at 8-9) Finally, Petitioners argue that requiring them to arbitrate their claims would be contrary to the expedient resolution of EIPA claims that the Cruz [*7]Court recognized would be afforded to debtors by bringing such claims in a special proceeding in court. (Id. at 9-10) If EIPA claims like theirs were arbitrable, Petitioners argue, they would need to initiate two successive actions to secure relief—the arbitration proceeding to secure an award and then a court action to affirm the arbitration award—which would cause procedural complexity and delay, allegedly frustrating the Legislature's intent to provide for quick resolution of EIPA claims. (Id.) Thus, according to Petitioners, Cruz effectively precludes arbitration of Petitioners' EIPA claims.
Petitioners' statutory arguments against arbitration rely on the text of CPLR §§ 5222-a, 5239, and 5240 as well as the "practical application" of the procedures and remedies established therein:
• Initially, Petitioners point to the repeated use of the word "court" in both CPLR §§ 5239 and 5240, arguing that its use indicates the Legislature's intent that any claims pursuant to these statutes be brought in court, not in arbitration. (Id. at 7-8)
• Petitioners also argue that both CPLR §§ 5239 and 5240 provide for remedies that are unavailable in arbitration. Specifically, CPLR § 5239 permits a court to vacate the relevant execution or court order, void the levy, direct the disposition of the property or debt, award damages against a claimant in connection with a fraudulent claim, and permit the intervention of interested parties—each of which remedies Petitioners contend are unavailable in an arbitral forum. (Id. at 8) Similarly, CPLR § 5240 provides that a court may "make an order denying, limiting, conditioning, regulating, extending or modifying the use of any enforcement procedure"—forms of relief that Petitioners again claim are beyond the scope of an arbitrator's power. (Id.)
• With respect to CPLR § 5239, Petitioners further argue (1) that the statute's allowance for any interested party, including third parties who may not be subject to arbitration agreements, to bring claims to determine their rights to property and (2) that the statute's inclusion of specific venue provisions both preclude arbitration. (Id.)
• Finally, Petitioners argue that CPLR § 5222-a(d)'s procedure permitting a judgment-creditor to seek adjudication of a judgment-debtor's exemption claims in "court," pursuant to CPLR § 5240, precludes arbitration of EIPA claims. (Id. at 9)
In addition to contending that their EIPA claims are not arbitrable, Petitioners also contend that the Arbitration Agreements are unenforceable as procedurally and substantively unconscionable.[FN3]
(Id. at 11-15)
In its reply, Citibank first notes that both Cruz and the EIPA are silent as to whether EIPA claims may be arbitrated. (Citibank N.A.'s Reply Memorandum of Law in Further Support of Its Motion to Compel Arbitration Under CPLR § 7503, dated September 17, 2021 (NYSCEF Doc. 34) ("Resp.'s Reply Mem."), at 4) Cruz, Citibank argues, "did not hold—explicitly or implicitly—that EIPA disputes were not arbitrable," but instead "held only that the EIPA provides no plenary right of action against a bank, and, thus, relief for an alleged statutory violation is limited to remedies provided by CPLR Article 52." (Id. (citing Cruz, 22 NY3d at 78)). "The Court of Appeals did not address the question of whether those remedies were to be [*8]exclusively addressed by a judge, as opposed to an arbitrator whom the parties agreed would resolve all disputes between them." (Id.)
The EIPA, Citibank argues further, does not contain any explicit language prohibiting arbitration, unlike other statutes in which the Legislature has made its intent to do so clear. (Id. at 4-5) Citibank points to CPLR § 7515 as an example. (Id.) There, the Legislature included express language prohibiting a clause in a contract requiring arbitration of sexual discrimination or harassment claims. (Id. (citing CPLR § 7515(a)(2), (b)(i))). The Legislature's failure to include similar language in the EIPA, Citibank argues, is evidence that the Legislature did not intend to preclude arbitration of EIPA claims.
Citibank also challenges Petitioners' reliance on the use of the word "court" in CPLR §§ 5222-a, 5239, and 5240. According to Citibank, the U.S. Supreme Court rejected Petitioners' theory that use of that word in a statute reflects the drafters' intent to preclude arbitration of claims brought pursuant to the statute. (Id. at 5 (citing CompuCredit Corp. v. Greenwood, 565 U.S. 95 (2012))).
Addressing Petitioners' contention that the remedies provided under CPLR §§ 5239 and 5240 are unavailable in arbitration, Citibank argues to the contrary: that, in fact, each of the remedies that Petitioners seek in this proceeding—money damages and injunctive relief—can be provided by an arbitrator. (Id. at 7) But even if elements of Petitioners' sought-after relief were unavailable in arbitration, Citibank contends that the proper course is to stay the judicial proceeding as to the non-arbitrable claims pending completion of arbitration of the arbitrable claims. (Id. (citing Anderson St. Realty Corp. v. New Rochelle Revitalization, LLC, 78 (AD3d 972, 975 (2d Dep't 2010))
Next, as to Petitioners' contention that requiring arbitration would lead to procedural complexity and delay, thereby frustrating the Legislature's intent to provide for quick resolution of EIPA claims, Citibank counters that judicial confirmation of an award is inherent to arbitration and that if such procedure were enough to render the Arbitration Agreements unenforceable, then "arbitration agreements would be rendered unenforceable as a general proposition." (Id. at 8)
Finally, Citibank argues that even if Petitioners' legal arguments are correct, Petitioners' EIPA claims are still arbitrable because the Arbitration Agreements are governed by the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 et seq., and the FAA preempts any state law that attempts to prohibit contractual arbitration. (Id. at 6 (citing AT&T Mobility LLC v. Concepcion, 563 U.S. 333, 341 (2011)).
B. The Supplemental Briefs
On January 19, 2022, the Honorable Kenneth L. Thompson, J.S.C., issued an Interim Order in this proceeding.[FN4]
(NYSCEF Doc. 36) Noting Citibank's citation to the FAA in its reply [*9]brief, but no citation to the FAA in Citibank's moving brief or in Petitioners' opposition brief, Justice Thompson concluded that the issue of the FAA's application to the motion had not been fully briefed. Accordingly, Justice Thompson placed the motion and the Verified Petition back on the calendar "only with respect to the issue of the applicability of the FAA to Citibank's motion pursuant to CPLR 7503." (Id. at 1) Justice Thompson permitted Petitioners "to submit a sur-reply on [the] FAA issue only" and permitted Citibank "to submit a sur-sur-reply on the FAA issue only." (Id. (emphasis added))
On February 28, 2022, Petitioners filed their sur-reply. (Petitioners' Supplemental Memorandum of Law in Opposition to Respondent's Motion to Compel Arbitration, dated February 24, 2022 (NYSCEF Doc. 38) ("Pets.' Suppl. Mem.")) The document is 19 pages, only approximately four of which address the FAA's application to the motion. (See id. at 7-10) The majority of the sur-reply either raises entirely new arguments challenging the formation of the Arbitration Agreements or responds to Citibank's reply arguments concerning the use of the word "court" in the statutes, the availability of certain statutory remedies in arbitration, and the Arbitration Agreements' unconscionability. (See id. at 3-5, 12-19) Because Justice Thompson's Interim Order only authorized a sur-reply addressing the FAA issue, however, the Court considers only Petitioners' FAA-related arguments in deciding the motion and disregards any unrelated arguments.
Likewise, with respect to Citibank's sur-sur-reply, the Court considers only those arguments responding to Petitioners' FAA-related arguments propounded in their sur-reply. (Citibank N.A.'s Response to Petitioners' Supplemental Memorandum of Law, dated March 25, 2022 (NYSCEF Doc. 40) ("Resp.'s Suppl. Mem."))
Initially, in their sur-reply, Petitioners do not contend that the FAA is inapplicable to the Arbitration Agreements.[FN5]
(See generally Pets.' Suppl. Mem.) Rather, Petitioners contend that Citibank's preemption arguments are erroneous. Specifically, Petitioners argue that CPLR §§ 5239 and 5240 are neutral procedural statutes that do not "outright prohibit[] the arbitration of a particular type of claim, or disfavor[] contracts that have defining features of arbitration agreements," and thus the FAA does not preempt these statutes. (Id. at 7 (citing Gerling Global Reins. Corp. v. Home Ins. Co., 302 AD2d 118, 125 (1st Dep't 2002)) Further, Petitioners argue that because federal courts rely on state law in matters of judgment enforcement, Congress did not intend that the FAA would preempt those same state statutes, otherwise Congress "would have provided for federal judgment enforcement procedures." (Id. at 8-9 (citing Fed. R. Civ. P. 69(a)(1); Dulce v. Dulce, 233 F.3d 143, 146 (2d Cir. 2000)) Finally, Petitioners argue that preemption is inappropriate because, as a matter of public policy, "judgment enforcement [*10]authority should not be ceded to an arbitrator." (Id. at 9 (citing RTM Capital Partners, Inc. v. Barnes, 2021 WL 5630019, at *12 (D. Conn. Nov. 30, 2021))
In its sur-sur-reply, Citibank contends that the FAA does not preempt only state laws that explicitly prohibit arbitration, as Petitioners claim, but preempts "any state law that is inconsistent with arbitration or creates obstacles to arbitration." (Resp.'s Suppl. Mem. at 4 (citing Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Jr. Univ., 489 U.S. 468, 477 (1989)) Similarly, Citibank also contends that, contrary to Petitioners' argument, the FAA preempts procedural laws or rules "that interfere[] with the right of parties to enforce an arbitration agreement according to its terms." (Id. at 5)
IV. Discussion
A. The Federal Arbitration Act Governs the Arbitration Agreements
As Justice Thompson recognized, whether the FAA applies to the Arbitration Agreements is a critical threshold issue. While Petitioners clearly dispute what impact, if any, the FAA has on their claims in this proceeding, they do not, in fact, dispute that the FAA applies to the Arbitration Agreements.
Nor could they. Each of the Arbitration Agreements contains clauses providing that Citibank and its customers "agree that our relationship includes transactions involving interstate commerce and that these arbitration provisions are governed by, and enforceable under, the [FAA]." (Haslam Aff. Ex. B at 41; id. Ex. D at 54; id. Ex. G at 8; id. Ex. H at 54) Therefore, the agreements themselves (and so too any party who ultimately agrees to them) have expressly elected to apply the FAA. The Court should, and will, uphold that election. See Todd Walters v. Luxottica of Am. Inc., No. 8:23-cv-01099, 2024 WL 661195, at *4-5 (C.D. Cal. Jan. 5, 2024) ("The Arbitration Agreement . . . clearly states it 'is governed by the Federal Arbitration Act (9 U.S.C. §§ 1-16).' Thus, the court concludes that the FAA applies . . . ."); Smith v. Sanders Realty Holdings, LLC, No. 1:20-cv-03617, 2021 WL 2651816, at *4 (N.D. Ga. Jan. 15, 2021) ("Where . . . the intent of the parties indicates that arbitration would be governed by the FAA, courts will enforce the intentions of the parties." (citations omitted)); Barrera v. Apple Am. Grp. LLC, 313 Cal. Rptr. 3d 175, 187 (Cal. Ct. App. 2023) ("The FAA applies to contracts that involve interstate commerce, but since arbitration is a matter of contract, the FAA also applies if it is so stated in the agreement." (citations omitted)); Mazza v. Air Acad. Fed Credit Union, Nos. 2020CV32226, 2020CV32227, 2021 WL 11669965, at *3 (Colo. Dist. Ct. Jan. 5, 2021) ("Where an arbitration provision expressly incorporates the Federal Arbitration Act . . . , the FAA provides the applicable arbitration law." (citations omitted)); Victrola 89, LLC v. Jaman Props. 8 LLC, 260 Cal. Rptr. 3d 1, 7-9 (Cal. Ct. App. 2020) ("[W]hen an agreement provides that its 'enforcement' shall be governed by the FAA, the FAA governs a party's motion to compel arbitration."); Ellis v. JF Enters., LLC, 482 S.W.3d 417, 418-19 (Mo. 2016) (en banc) ("Here, there is no question that the FAA applies—both under the Supremacy Clause and as a matter of the parties' express agreement." (emphasis added)); In re HEB Grocery Co., L.P., 299 S.W.3d 393, 397 (Tex. App. 2009) ("The FAA may govern a written arbitration clause enforced in Texas state court if the parties have expressly contracted for the FAA's application. When the parties have designated the FAA to govern their arbitration agreement, their designation should be [*11]upheld." (citing In re AdvancePCS Health, L.P., 172 S.W.3d 603, 605-06 & n.3 (Tex. 2005))).[FN6]

B. Neither Cruz Nor CPLR Article 52 Precludes Arbitration of Petitioners' Claims
Based on Petitioners' proposed reading and application of the Court of Appeals' decision in Cruz, 22 NY3d 61, and on the text and "practical application" of CPLR Article 52, Petitioners argue that EIPA claims like theirs cannot be arbitrated. For the reasons discussed below, however, the Court rejects each of Petitioners' arguments and finds that judgment-debtors' EIPA claims against banks can, in fact, be arbitrated.
Significantly, in reaching that conclusion, the Court notes that it conducted its analysis against the backdrop of both Federal and New York policy strongly favoring arbitration. The FAA, which governs here, "was 'enacted to replace judicial indisposition to arbitration,' and is an expression of a 'strong federal policy favoring arbitration as an alternative means of dispute resolution.'" Ross v. Am. Express Co., 547 F.3d 137, 142 (2d Cir. 2008) (quoting Hall St. Assocs., L.L.C. v. Mattel, Inc., 55 U.S. 576, 581 (2008)). Indeed, it has been observed that "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy [courts] have often and emphatically applied." Ragone v. Atl. Video at Manhattan Ctr., 595 F.3d 115, 121 (2d Cir. 2010) (internal quotation marks and citation omitted). New York similarly views arbitration as a means of "conserving the time and resources of the courts and the contracting parties." Am. Int'l Specialty Lines Ins. Co. v Allied Capital Corp., 35 NY3d 64, 70 (2020) (quoting Nationwide Gen. Ins. Co. v. Investors Ins. Co. of Am., 37 NY2d 91, 95 (1975)). Accordingly, "New York courts interfere as little as possible with the freedom of consenting parties to submit disputes to arbitration." Stark v. Molod Spitz DeSantis & Stark, P.C., 9 NY3d 59, 66 (2007) (internal quotation marks and citation omitted).
i. Cruz Does Not Require that a Judgment-Debtor's EIPA Claims Against a Bank Be Brought in Court
Because Petitioners rely heavily on the implications of Cruz, an initial examination of the context in which that decision was made and of its conclusions and reasoning is necessary to resolve the motion.
As Petitioners' counsel is aware,[FN7]
Cruz is the result of two questions certified to the Court of Appeals, pursuant to New York Constitution, article VI, § 3(b)(9) and 22 N.Y.C.R.R. § 500.27, by the U.S. Court of Appeals for the Second Circuit:
1. Whether judgment-debtors have a private right of action for money damages and injunctive relief against banks that violate the EIPA's procedural requirements; and
2. Whether judgment-debtors can seek money damages and injunctive relief against banks that violate the EIPA in special proceedings prescribed by CPLR Article 52 and, if so, whether those special proceedings are the exclusive mechanism for such relief or whether judgment debtors may also seek relief in a plenary action.
22 NY3d at 69-70 (quoting Cruz v. TD Bank, N.A., 711 F.3d 261, 271 (2d Cir. 2013)). The appellants, customers of T.D. Bank, N.A. and Capital One Bank, N.A., had lost in the district courts on the question of whether the EIPA afforded them a private right of action. See Cruz v. T.D. Bank, N.A., 855 F. Supp. 2d 157 (S.D.NY 2012); Martinez v. Capital One Bank, N.A., 863 F. Supp. 2d 256 (S.D.NY 2012).
For several reasons, like the district courts, the Court of Appeals also determined that no private right of action could be implied in the EIPA, answering the first certified question in the negative. The Court of Appeals held, first, that, contrary to the appellants' argument, the Legislature did not, by including a provision exempting banks from liability for inadvertently failing to provide the forms required by CPLR § 5222-a, intend to imply a private right of action against banks for violating the EIPA. Cruz, 22 NY3d at 72. The doctrine of expressio unius est exclusio alterius "is typically used to limit the expansion of a right or exception—not as a basis for recognizing unexpressed rights by negative implication," id. (citation omitted), so, the Court of Appeals reasoned, it would be unusual to apply that doctrine as the appellants proposed. More directly to the point, the Court of Appeals concluded that "if the legislature had intended to impose new liability on banks when they act as garnishees of the funds of judgment debtors, it would have said so in the statute." Id.
The Court of Appeals next noted that the EIPA was modeled on a Connecticut statute. Id. at 72. Unlike New York, however, "Connecticut . . . explicitly imposes liability on banks in its statute." Id. at 72-73. But, like New York, Connecticut safeguards banks from liability for inadvertent violations of the statute. Id. at 73. Based on the Legislature incorporating a similar safe-harbor provision but not a similar liability provision in the EIPA, the Court of Appeals concluded that the Legislature had further indicated its intent not to impose liability on banks for EIPA violations. Id.
Properly employing the doctrine of expressio unius est exclusio alterius, the Court of Appeals went on to find that the EIPA's inclusion of a provision expressly allowing for recovery of damages against judgment-creditors who violate the statute, while not including a similar provision relating to banks, also indicates the Legislature's intent not to create the same kind of liability in banks. Id. at 73-74.
The Court of Appeals next held—most significantly for purposes of the arguments raised in this motion—that recognition of a private right of action against banks under the EIPA would be "[in]compatible with the comprehensive enforcement mechanisms the legislature included . . . in CPLR article 52." Id. at 74. It further held that "[t]he fact that significant enforcement mechanisms are built into CPLR article 52—and, indeed, predated the EIPA—militates against recognition through implication of a new type of claim against banks falling outside the statutory scheme." Id. at 75. "Considering the statutory scheme overall, it appears that the legislature intended to use banks as a conduit for information so that exemption rights would be timely communicated to judgment debtors but did not intend this role to subject banks to a new type of liability." Id. at 76.
As to the specific Article 52 enforcement mechanisms available to a judgment-debtor who believes that a bank failed to comply with the EIPA in responding to a restraining notice, the Court of Appeals wrote:
[N]othing prevents a party injured in the manner alleged by plaintiffs from seeking redress against a bank in a CPLR 5239 or 5240 proceeding. A judgment debtor is certainly an "interested person" and CPLR 5239 permits such a party to bring a proceeding against any "other person with whom a dispute exists to determine rights in the property." Thus, if a judgment debtor believes that a bank has restrained assets in error in violation of the EIPA—meaning there is a controversy between the bank and the account holder over access or "rights" in the deposited funds—he or she can obtain a civil remedy, such as the release of any money unlawfully restrained, an injunction barring transfer of exempt property to the sheriff or judgment creditor, or reimbursement of any bank fees improperly charged. Comparable relief would be available under CPLR 5240, even after the assets have been transferred to the judgment creditor; in that event, the judgment creditor could be joined as a party and the court could reverse the transfer by issuing an order "denying" the execution and directing restitution by the judgment creditor. Provided relief is sought in the appropriate forum in a timely manner, the judgment creditor is not entitled to retain exempt funds secured in error. If banks make mistakes, the special proceedings in CPLR article 52 afford an avenue for relief.
Id. at 75-76 (footnotes omitted).
Finally, the Court of Appeals reflected on the purpose of the EIPA and how it would be undermined if a private right to a plenary action were to be found. Specifically, the Court of Appeals observed that "[t]he point of the [EIPA] was to help debtors notify banks of the presence of exempt funds in their accounts in order to prevent those funds from being restrained in the first instance—not to create yet another opportunity for litigation on the back end after an improper restraint was imposed." Id. at 76-77. Further, in that same vein, according to the Court of Appeals "there is no basis to suppose that the legislature expected that injured judgment debtors would commence complicated and lengthy plenary proceedings to vindicate their rights, such as the federal court actions that [the appellants] brought here." Id. at 77. Rather, the Court of Appeals held, "[i]f a lawsuit remains necessary due to a bank's noncompliance with the EIPA, the existing proceedings in CPLR article 52 are adequate to afford a judgment debtor appropriate relief," and those proceedings "have the advantage of being swift and without procedural complexity." Id.
After having answered the first certified question in the negative—i.e., that a private right of action cannot be implied in the EIPA—the Court of Appeals proceeded to answer the second certified question by concluding that a judgment-debtor could seek relief under the statutory mechanisms already available in CPLR Article 52 and that such mechanisms are the "exclusive" means to do so:
As for the second certified question, a judgment debtor can secure relief from a bank arising from a violation of the EIPA in a CPLR article 52 special proceeding as we have explained. And our determination that the legislation created no private right of action compels the conclusion that the statutory mechanisms for relief are exclusive. Banks had no obligation under the common law to forward notices of exemption and exemption claim forms to judgment debtors. It therefore follows that any right debtors have to enforce that obligation, among others imposed under CPLR 5222-a, arises from the [*12]statute and, since the EIPA does not give rise to a private right of action, the only relief available is that provided in CPLR article 52.
Id. at 78-79.
1. Cruz Does Not Address Arbitration of a Judgment-Debtor's EIPA Claims Against a Bank
Petitioners first argue that by deeming an Article 52 special proceeding the "exclusive" means by which a judgment-debtor can seek relief against a bank for violations of the EIPA, the Cruz Court meant to preclude adjudication of such claims in any forum other than a court. According to Petitioners' argument, this would make their EIPA claims nonarbitrable. This Court, however, is unconvinced.
In this Court's view, Cruz should be read as deciding only the procedures available to judgment-debtors if they wish to seek relief for violations of the EIPA in a court. Therefore, when the Court of Appeals determined in Cruz that a special proceeding pursuant to Article 52 is the exclusive means by which an aggrieved judgment-debtor can seek relief against a bank, the implication was not that all other forums for initial adjudication of the dispute were barred; rather, the clear implication was that if a court of law is chosen as the initial forum, then the exclusive available procedures are under Article 52. The Court of Appeals was presented with specific certified questions, and whether a judgment-debtor's EIPA claims are judicable in an arbitral forum in the first instance was beyond the scope of those questions and not decided. Petitioners ask this Court to go too far, without any convincing justification, when they ask it to imply from Cruz's use of the term "exclusive" an absolute prohibition on arbitration of EIPA claims against banks.
2. Cruz's Observation that Judgment-Creditors Could be Joined to a Judgment-Debtor's Proceeding Against a Bank Does Not Preclude Arbitration
Petitioners next argue that EIPA claims are nonarbitrable because Cruz stated that, in circumstances where funds restrained in violation of the EIPA have been improperly transferred to a judgment-creditor, the judgment-debtor could join the judgment-creditor to a CPLR § 5240 proceeding against a bank. Because the judgment-creditor typically would not be party to a contractual agreement between the judgment-debtor and the bank giving rise to an arbitration right, Petitioners argue that joining the judgment-creditor to an arbitration proceeding against the bank would be impossible. Petitioners reason, therefore, that, due to the unavailability of this procedure in arbitration, their EIPA claims against Citibank cannot be arbitrated. The Court, however, is again unconvinced.
Initially, as the Court discusses more fully below in parsing and rejecting Petitioners' arguments based on the statutory text and the "practical application" of the statutory enforcement procedures, Petitioners' argument is based on a hypothetical situation not reflective of the reality of this proceeding. Petitioners have not sought joinder of the proposed class members' likely myriad judgment-creditors here, and they have given no indication that they ever intend to do so. Indeed, the Verified Petition does not seek relief, pursuant to CPLR § 5240, against any judgment-creditor, only against Citibank. In this case, the unavailability of joinder of nonparties to the Arbitration Agreements in an arbitration proceeding should not preclude arbitration of Petitioners' EIPA claims against Citibank as it is a hypothetical argument.
But even accepting the hypothetical and looking in the abstract at the ability of any judgment-debtor who might wish to seek relief from a bank and a judgment-creditor pursuant to CPLR § 5240 for violations of the EIPA, as Cruz permits, the Court's ultimate conclusion [*13]remains unchanged: the judgment-debtor's EIPA claims against the bank are arbitrable if an applicable arbitration agreement exists.
One of the flaws in Petitioners' argument to the contrary is a misreading of Cruz. Petitioners again ignore the context that, in Cruz, the Court of Appeals was deciding, based on specific certified questions, what procedures and remedies were available to a judgment-debtor seeking relief against a bank. It therefore presupposed a pending CPLR § 5240 special proceeding against a bank and posited, based on those circumstances, what a judgment-debtor could do to simultaneously, in the same proceeding, secure relief against a judgment-creditor in possession of funds transferred to it in violation of the EIPA. But that does not mean that a judgment-creditor must always be joined to an already pending CPLR § 5240 special proceeding against a bank to secure relief against the judgment-creditor. Petitioners effectively attempt to take Cruz's suggestion as to what judgement-debtors can do vis-à-vis judgment-creditors in the specific circumstances there under consideration and turn it into a requirement in all circumstances. That is an incorrect reading and application of Cruz.
Cruz itself recognizes that where a judgment-debtor seeks, pursuant to CPLR § 5240, the return of funds transferred in violation of the EIPA, the party responsible for returning those funds is the judgment-creditor, not the bank that made the improper transfer, even where the judgment-creditor is joined to a pending proceeding against the bank. See 22 NY3d at 76 ("[T]he court could reverse the transfer by issuing an order 'denying' the execution and directing restitution by the judgment creditor." (emphasis added)). Additionally, the district court in this very case (before it was dismissed from federal court on jurisdictional grounds) interpreted Cruz in the same manner:
A judgment debtor may thus pursue remedies against a judgment creditor under section 5240. Therefore, where there has been a transfer of funds by a bank to a judgment creditor which includes improperly restrained exempt property, the judgment debtor's remedy is against the judgment creditor and not the garnishee-bank.
A successful proceeding against the judgment creditor holding the wrongfully transferred funds, together with an award of interest thereon, affords the judgment debtor complete relief with one exception. The bank, itself, may have charged the judgment debtor fees, including administrative fees for the garnishment, fees for checks returned for insufficient funds, or fees for a low account balance. If these fees would not have been incurred had the exemption been honored, then the judgment debtor may recover them against the bank under section 5240.
. . . . Once a transfer has been made, the judgment debtor's remedies under section 5240 lie against the judgment creditor, except that the judgment creditor may recover against the garnishee-bank any fees improperly charged to the judgment debtor.
Acevado v. Citibank, N.A. (Acevado I), No. 10 Civ. 8030 (PGG), 2015 WL 13860934, at *5-6 (S.D.NY Mar. 13, 2015) (quoting Cruz v. T.D. Bank, N.A., No. 10 Civ. 8026 (PKC), 2014 WL 1569491, at *9 (S.D.NY Apr. 17, 2014)); Acevado v. Citibank, N.A. (Acevado II), No. 10 Civ. 8030 (PGG), 2020 WL 3639702, at *5, *7 (S.D.NY July 6, 2020) ("[T]his Court has repeatedly ruled that the remedies against a bank for violations of the EIPA are limited and do not include recovery of funds transferred to a third-party judgment creditor. . . . The Court of Appeals' suggestion [in Cruz], instead, that plaintiffs seek relief by joining the judgment-creditor as a party to the action is persuasive evidence that it would reject a lower court's ruling that funds unlawfully aggregated by a bank, and then transferred to a judgment-creditor, could be recovered [*14]from the bank." (internal quotation marks and citations omitted)). This Court is bound by Cruz, and it agrees with the district court that Cruz permits a judgment-debtor to recover funds transferred in violation of the EIPA only from the in-possession judgment-creditor.
What this all means is that the dilemma that Petitioners say precludes arbitration of their EIPA claims against Citibank is, in fact, no dilemma at all. Even if Petitioners were seeking restitution from their judgment-creditors of funds unlawfully transferred to them by Citibank, Petitioners could maintain that claim in court, while a claim against Citibank for improperly charged fees could proceed separately in arbitration. And any judgment-debtor, not just Petitioners, could similarly proceed with the same set of claims pursuant to CPLR § 5240 in the same manner—one in court and the other in arbitration. Of course, whether the court proceeding would need to be stayed pending resolution of the arbitration is a potential issue but one ultimately beyond the scope of this decision. In any event, there is no reason, compelling or otherwise, to read Cruz as requiring anything different.
3. Cruz's Observation that a Special Proceeding Provides a Speedy and Less Procedurally Complex Means of Resolving a Judgment-Debtor's EIPA Claims Does Not Preclude Arbitration
Petitioners' final argument concerning Cruz is that permitting arbitration of EIPA claims against banks would undermine the speedy resolution of such claims, an advantage that the Cruz Court recognized is inherent in Article 52 special proceedings. Petitioners' argument proceeds from the fact that an arbitration award must be confirmed by a court in order for it to be converted into an enforceable order or judgment, thus necessitating that a judgment-debtor engage in the two-step process of arbitration and subsequent court action. Once again, however, the Court is unconvinced.
Petitioners again take far too much from Cruz. There, the Court of Appeals found that an Article 52 special proceeding's relative swiftness and lack of procedural complexity is consistent with the Legislature's intent "not to create yet another opportunity for litigation on the back end after an improper restraint was imposed" and, accordingly, not to create a private right of action against banks. Cruz, 22 NY3d at 77-78. The advantages of Article 52 special proceedings were, however, considered only in comparison to "complicated and lengthy plenary proceedings." The Court of Appeals had no occasion or reason to comment on potential arbitration of a judgment-debtor's EIPA claims, as it simply was not at issue in Cruz. So, again, there is no express or implied basis in Cruz to conclude that the Court of Appeals intended that arbitration of EIPA claims be unavailable.
Further, the Court of Appeals' approval of a special proceeding's relative swiftness and lack of procedural complexity should not be read in this context as disapproval of arbitration. Quite the opposite, in fact. Arbitration is generally considered a preferred alternative forum precisely because it can provide speedy resolution to parties' disputes without the complex procedural and evidentiary rules that govern plenary court actions. This is reflected in the well-settled, strong policy preference for arbitration in New York and under the FAA. See, e.g., Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp., 559 U.S. 662, 685 (2010) ("In bilateral arbitration, parties forgo the procedural rigor . . . in order to realize the benefits of private dispute resolution: lower costs, greater efficiency and speed, and the ability to choose expert adjudicators to resolve specialize disputes."); Sprinzen v. Nomberg, 46 NY2d 623, 629 (1979) ("An agreement to submit to arbitration disputes arising out of a contract . . . is now favorably recognized as an efficacious procedure whereby parties can select their own nonjudicial forum for the private and practical resolution of their disputes with maximum dispatch and at minimum expense." (internal [*15]quotation marks and citations omitted)). Rather than rejecting arbitration, therefore, the Court of Appeals would likely view it as providing benefits to a judgment-debtor seeking relief from a bank similar to those provided by a special proceeding and as similarly consistent with the Legislature's intent "not to create yet another opportunity for litigation on the back end after an improper restraint was imposed." Cruz, 22 NY3d at 77-78.
Notwithstanding the foregoing, the real crux of Petitioners' argument is that the need to confirm an arbitration award in court effectively creates the back-end litigation that the Cruz Court viewed as avoided by limiting the relief mechanisms to those available in an Article 52 special proceeding. This Court, however, is unconvinced that the proceeding necessary to confirm an arbitration award (or to modify or vacate it) constitutes the kind of back-end litigation with which the Cruz Court and the Legislature were concerned. The Cruz Court identified a plenary civil action with broad claims for damages and injunctive relief as the type of litigation inconsistent with the Legislature's intent as expressed in the EIPA. Unless a related action or special proceeding is pending, however, arbitration awards are confirmed in New York via a special proceeding pursuant to CPLR Article 75. See CPLR §§ 7502, 7510-11. Such a proceeding would not involve the broad claims for damages or injunctive relief that the Cruz Court found inconsistent with the Legislature's intent. And if, like here, there is already a pending action or special proceeding related to the arbitration (such as one in which arbitration was demanded and compelled), then the arbitration award is properly confirmed by motion in that pending action or proceeding. See id. § 7502(a)(iii); In re Wicks Constr., Inc., 295 AD2d 527, 528 (2d Dep't 2002) ("Pursuant to CPLR 7502(a)(iii), the motion to confirm the arbitration award should have been brought in the action commenced by the appellants."). In the latter scenario—the scenario that would come into play here if Petitioners or Citibank seek confirmation of any future arbitration award—no new proceeding even needs to be initiated. Simply put, in either scenario, no lengthy or procedurally complex plenary litigation is required to confirm an arbitration award.
Additionally, Petitioners' argument has potentially broad consequences beyond this particular proceeding. The need to confirm an arbitration award to convert it into an enforceable court order or judgment is an inherent aspect of arbitration. There simply is no avoiding it where full voluntary compliance with the award cannot be achieved. Thus, if the Court were to adopt Petitioners' argument, the Court would effectively be declaring a broad category of claims—any that the Legislature has designated to be brought via a special proceeding—nonarbitrable by default. But Petitioners do not provide any justification or support whatsoever for such a sweeping limitation.
In summary, Petitioners' arguments concerning Cruz, independently or collectively, fail to convince the Court that the Court of Appeals intended by its decision in Cruz to preclude arbitration of judgment-debtors' EIPA claims against banks, such as Petitioners' claims against Citibank here.
ii. Neither the Text Nor the "Practical Application" of Article 52 Bars Arbitration of Petitioners' Specific EIPA Claims
1. The Legislature's Use of the Term "Court" Is Not Evidence of An Intent to Bar Arbitration
Petitioners' first textual argument is that: because CPLR §§ 5222-a, 5239, and 5240 use the term "court" when referring to claims, any proceeding pursuant to those statutes may only be brought in a court, not in arbitration. In a way (but only to the extent discussed below), [*16]Petitioners are correct: the Legislature's use of the term "court" in CPLR §§ 5222-a, 5239, and 5240 indicates its anticipation and intent that any claims would be brought in a court of law. Contrary to Petitioners' contention, however, that does not mean that the Legislature also intended to bar arbitration of the same claims. Drawing that conclusion is simply unwarranted.
Any analysis of this issue must necessarily account for the context in which legislation is drafted. The Legislature is the legislative branch of government. When it crafts laws that provide civil relief to private individuals or entities for certain identified wrongs, it does so, generally, through resort to another branch of government. It does not draft legislation with an eye toward adjudication of disputes and provision of relief via an entirely private forum such as arbitration. So, where the Legislature contemplates resort to the judicial branch to resolve civil disputes arising from the circumstances that its legislation addresses, its use of the term "court" in that legislation is only to be expected.
But mere use of the term "court" in legislation, without more, does not constitute evidence that the Legislature sought to bar arbitration. As Citibank has correctly identified, the U.S. Supreme Court rejected that exact logical fallacy in CompuCredit, 565 U.S. at 100-02. There, just like Petitioners here, credit-card customers of CompuCredit sought to avoid arbitration on the ground that the statue under which they had brought their class-action claims made "repeated use of the terms 'action,' 'class action,' and 'court'—terms that they say call to mind a judicial proceeding." Id. at 100. In rejecting that argument, the Supreme Court first concluded that such "references cannot do the heavy lifting that respondents assign them," and it then continued as follows:
It is utterly commonplace for statutes that create civil causes of action to describe the details of those causes of action, including the relief available, in the context of a court suit. If the mere formulation of the cause of action in this standard fashion were sufficient to establish the contrary congressional command overriding the FAA, valid arbitration agreements covering federal causes of action would be rare indeed. But that is not the law. . . .
Moreover, if one believes that [the statute's] contemplation of court suit . . . establishes a nonwaivable right to initial judicial enforcement, one must also believe that it establishes a nonwaivable right to initial judicial enforcement in any competent judicial tribunal, since it contains no limitation. We think it clear, however, that this mere "contemplation" of suit in any competent court does not guarantee suit in all competent courts, disabling the parties from adopting a reasonable forum-selection clause. And just as the contemplated availability of all judicial forums may be reduced to a single forum by contractual specification, so also can the contemplated availability of judicial action be limited to judicial action compelling or reviewing initial arbitral adjudication. The parties remain free to specify such matters, so long as the guarantee of [the statute]—the guarantee of the legal power to impose liability—is preserved.
Id. at 102 (internal quotation marks and citations omitted). "In other words, the mere fact that the statute mentions a particular concept or procedure does not mean that such concept or procedure is a 'right' or 'protection' that cannot be waived." King v. Capital One Bank (USA), N.A., No. 3:11-cv-00068, 2012 WL 5570624, at *10 (W.D. Va. Nov. 15, 2012) (interpreting CompuCredit, 565 U.S. at 102).
The same reasoning applies here. By mere use of the term "court" in CPLR §§ 5222-a, 5239, and 5240, the Legislature did not intend to create a nonwaivable right to initial [*17]adjudication in a court. Petitioners have offered nothing in the way of caselaw or legislative history that supports a contrary conclusion.
2. The Potential Unavailability in Arbitration of Some Remedies Provided by CPLR §§ 5239 and 5240 Does Not Preclude Arbitration of Petitioners' Claims
Petitioners' next argument—part of their overarching "practical application" argument—is that because CPLR §§ 5239 and 5240 provide for an array of remedies, some of which may not be available in arbitration, a judgment-debtor's EIPA claims against a bank must be brought in court. But Petitioners' argument relies primarily on hypothetical red herrings and must be rejected.
The Court first determines which remedies Petitioners seek here and then which are available to them pursuant to Cruz and the Arbitration Agreements. This is because the Court will only consider those remedies that Petitioners actually seek and are actually available to them, and not remedies merely generally available under CPLR §§ 5239 and 5240 but in no way related to this proceeding, in deciding whether arbitration of Petitioners' specific claims should be compelled.
With respect to the remedies that Petitioners seek here, those remedies are as follows:
1. The return/release of any of the proposed class members' funds restrained by Citibank in violation of the EIPA;
2. The return of any fees that Citibank charged to the proposed class members in violation of the EIPA;
3. An injunction requiring Citibank to return any of the proposed class members' funds turned over to judgment-creditors in violation of the EIPA;
4. An injunction enjoining Citibank from limiting proposed class members' access to exempt funds to in-person withdrawals and requiring Citibank to give judgment-debtors access to exempt funds in their accounts in the same manner as any accountholder enjoys, including by ATM, check, or ACH withdrawal;
5. An injunction enjoining Citibank from aggregating all of the funds in the proposed class members' accounts prior to calculating restrained and exempt amounts; and
6. An injunction enjoining Citibank from turning over to judgment-creditors the proposed class members' funds exempt from restraint.
With respect to the remedies available to Petitioners as judgment-debtors seeking redress for a bank's violation of the EIPA, the Court of Appeals articulated just what those remedies are in Cruz. As the district court held in Acevado I, and with which holding this Court agrees, Cruz limited a judgment-debtor's remedies available under CPLR § 5239 to "the release of any money unlawfully restrained, an injunction barring transfer of exempt property to the sheriff or judgment creditor, or reimbursement of any bank fees improperly charged" and under CPLR § 5240 to recovery of any bank fees improperly charged. Acevado I, 2015 WL 13860934, at *6 (quoting Cruz, 2014 WL 1569491, at *9). Each of the three forms of relief available under § 5239, as the district court further noted, "is remedial in nature, aimed at undoing the effects of an improper account garnishment and restoring a judgment debtor to the position in which he or she would have been had the wrongful garnishment never taken place," and none "are . . . [the] forward-looking, deterrence-oriented relief of the type sought by plaintiffs." Id. at *5. Thus, the district court concluded, "[a]vailable remedies under section 5239 do not include punitive or exemplary damages, 'obey-the-law' injunctions, or disgorgement of unjust profits." Id. at *6. Further, if a judgment-debtor seeks the return of exempt funds unlawfully transferred to a [*18]judgment-creditor, the remedy lies against the judgment-creditor, not against the bank. Id.; Acevado II, 2020 WL 3639702, at *6-7.
Applying Cruz as interpreted in Acevado I and Acevado II to Petitioners' requested relief, it is clear that only the relief requested under numbers 1, 2, and 6 above are actually available to Petitioners. The relief sought under numbers 4 and 5 are "obey-the-law" injunctions like the injunction that the Cruz plaintiffs sought requiring TD Bank to comply with the requirements of the EIPA. See Acevado I, 2015 WL 13860934, at *5. Such injunctions were rejected by the district court because they are "precisely the 'opportunity for litigation on the back end after an improper restraint was imposed' which the New York Court of Appeals foreclosed as against a garnishee-bank." Id. (quoting Cruz, 2014 WL 1569491, at *8). Petitioners' sought-after relief under number 3 above also is unavailable to them under Cruz, Acevado I, and Acevado II because that relief is properly sought only against an in-possession judgment-creditor, not against a garnishee-bank like Citibank. Cruz, 22 NY3d at 76; Acevado I, 2015 WL 13860934, at *6; Acevado II, 2020 WL 3639702, at *5, *7.
Further, the Arbitration Agreements contain class-action waiver provisions providing that Petitioners and Citibank "agree that no class action, private attorney general or other representative claims may be pursued in arbitration, nor may such action be pursued in court if either you or we elect arbitration." Petitioners have not challenged these provisions in their filings. Therefore, any of the permissible relief that Petitioners seek to recover here on behalf of not only themselves but also the proposed class members may only be sought on Petitioners' own behalf in arbitration. See Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 236-38 (2013) ("The class-action waiver merely limits arbitration to the two contracting parties. It no more eliminates those parties' right to pursue their statutory remedy than did federal law before its adoption of the class action for legal relief in 1938."); Horton v. Dow Jones & Co., 804 F. App'x 81, 84-85 (2d Cir. 2020) (upholding class-action waiver provision in arbitration agreement); Tsadilas v. Providian Nat'l Bank, 13 AD3d 190, 191 (1st Dep't 2004) ("The arbitration provision is enforceable even though it waives plaintiff's right to bring a class action. . . . Under New York law, 'a contractual proscription against class actions . . . is neither unconscionable nor violative of public policy.'" (quoting Ranieri v. Bell Atl. Mobile, 304 AD2d 353, 354 (1st Dep't 2003), lv. denied 1 NY3d 502 (2003))).
Accordingly, in deciding whether Petitioners' EIPA claims may be arbitrated, the Court considers only whether an arbitral forum can provide the following relief: (1) the return/release of any of Petitioners' funds restrained by Citibank in violation of the EIPA; (2) the return of any fees that Citibank charged to Petitioners in violation of the EIPA; and (3) an injunction enjoining Citibank from turning over to judgment-creditors Petitioners' funds exempt from restraint under the EIPA.
The Court concludes that an arbitrator can, in fact, provide Petitioners with each of these forms of relief. There seems little real dispute between the parties that an arbitrator can award Petitioners damages in the amount of the funds that Citibank restrained and the fees that it charged Petitioners in violation of the EIPA, or that the arbitrator could issue an award ordering Citibank to make those restrained funds available to Petitioners in their accounts. And Petitioners do not appear to seriously challenge an arbitrator's ability to issue an injunction enjoining Citibank from transferring any unlawfully restrained funds to judgment-creditors, let alone provide any textual or caselaw support for the proposition that such relief is beyond the scope of an arbitrator's power.
Indeed, both the Arbitration Agreements and the applicable rules of the agreed-upon arbitration providers, the American Arbitration Association ("AAA") and JAMS, clearly provide the arbitrator with the requisite power. The Arbitration Agreements provide that the arbitrator is "empowered to award any damages or other relief provided for under applicable law." (Haslam Aff. Ex. B at 40; id. Ex. D at 53; id. Ex. G at 6; id. Ex. H at 53) Likewise, the AAA's Consumer Arbitration Rules, which are publicly available, grant the arbitrator the power to grant interim relief, such as an injunction, and to "grant any remedy, relief, or outcome that the parties could have received in court." (Am. Arbitration Assoc., Consumer Arbitration Rules R-37(a), R-44(a) (eff. Sept. 1, 2014), available at http://www.adr.org/sites/default/files/Consumer_Rules_ Web_2.pdf.) Similarly, JAMS's Comprehensive Arbitration Rules and Procedures, which are also publicly available, grant the arbitrator power to issue injunctions and "any remedy or relief that is just and equitable and within the scope of the Parties' Agreement." (JAMS, Comprehensive Arbitration Rules & Procedures R. 24 (eff. June 1, 2021), available at https:// www.jamsadr.com/rules-comprehensive-arbitration) Thus, a JAMS arbitrator's authority under that forum's rules is coextensive to with the broad authority provided under the Arbitration Agreements. Ultimately, each of these grants of authority to the arbitrator are clearly broad enough to encompass all of the permissible relief that Petitioners seek here.
In arguing against the arbitrability of their claims, Petitioners essentially ignore the nature of the relief that they seek in this proceeding and instead focus on the broader array of relief available under CPLR §§ 5239 and 5240. They argue that § 5239's provision for vacating an execution or order, voiding a levy, or directing the disposition of property or debt is beyond the scope of arbitral jurisdiction. They also argue that § 5240's allowance that a court may deny, limit, condition, regulate, extend, or modify the use of any enforcement procedure is similarly beyond the scope of arbitral jurisdiction. Without providing any support for those two propositions, Petitioners nonetheless contend that these alleged limitations on an arbitrator's power foreclose arbitration of their EIPA claims. The crux of their argument, although not made clear by them in their filings, appears to be that providing any of the foregoing kinds of relief would require the arbitrator to issue an award that conflicts with an existing court order or restraining notice. See Cruz, 22 NY3d at 76 ("Whether issued by a court or an attorney acting as an officer of the court, a restraining notice is an injunction and disobedience is punishable as contempt of court." (internal quotation marks and citations omitted)). But, as discussed below, the specific relief that Petitioners request in this proceeding does not require the arbitrator to countermand a court order or restraining notice. Further, it is unclear how relief countermanding a court order or restraining notice would ever be part of a judgment-debtor's claims against a bank for its failure to comply with the EIPA, as such claims are limited by Cruz.
Petitioners essentially conflate generalized judgment-enforcement proceedings with specific proceedings by judgment-debtors to recover against banks for EIPA violations. But that conflation is unwarranted. While EIPA claims such as Petitioners' are judgment-enforcement adjacent, because they borrow certain procedures and relief from CPLR §§ 5239 and 5240, they are not judgment enforcement. Cf. Cruz, 22 NY3d at 74 ("Given that the primary purpose of article 52 is to facilitate the enforcement of judgments, it provides procedures that can be invoked by judgment creditors . . . . But the article also contains general provisions that permit 'any interested person'—including a judgment debtor—to secure remedies for wrongs arising under the statutory scheme." (emphasis added)). Petitioners, and any other judgment-debtor in similar circumstances, do not seek to enforce a judgment; rather, they seek to enforce the EIPA. [*19]And, critically, the EIPA's restraint exemptions are self-effectuating and automatic. As explained in Cruz, the EIPA exempts from restraint an amount of a judgment-debtor's funds equivalent to "90% of 60-days wages under the federal or state minimum wage laws, whichever is greater." 22 NY3d at 66. And once a judgment-debtor returns a claim form to a bank and judgment-creditor, the judgment-creditor has eight days to lodge an objection, otherwise "the restraint is lifted with respect to the disputed funds and the monies are released to the judgment debtor." Id. at 67-68. It is the judgment-creditor's responsibility to object by timely commencing a special proceeding under CPLR § 5240. See id. at 68. Even then, "if 21 days pass and no judicial resolution of the exemption issue is forthcoming, the bank must release the disputed funds to the judgment debtor." Id. In other words, an arbitrator faced with claims like Petitioners need not vacate, modify, deny, limit, condition, regulate, or extend any execution, order, levy, or other judgment-enforcement tool issued by a court or judgment-creditor to enforce the EIPA's restraint exemptions—the statute itself makes the funds exempt from the judgment-enforcement tool from the outset. The arbitrator instead need only determine the amount of funds, if any, that were exempt from restraint and the amount of improperly charged fees, if any, and issue an award for that combined amount while, if appropriate, enjoining the bank from transferring the funds to judgment-creditors. The award merely enforces the EIPA's exemptions; it does not carve out funds from a restraining notice that were not already exempt under the EIPA.[FN8]

3. By Permitting Third Parties Such as Creditors to Commence a Proceeding, CPLR § 5239 Does Not Preclude Arbitration of EIPA Claims
Next, Petitioners argue that because CPLR § 5239 permits "any interested person [to] commence a special proceeding against the judgment creditor or other person with whom a dispute exists to determine rights in the property or debt," and because a third party may not be a signatory to an arbitration agreement with a bank, EIPA claims such as Petitioners must be adjudicated in court. The Court, however, rejects this argument for the essentially the same reasons that it rejected Petitioners' argument concerning the joining of judgment-creditors to an arbitration proceeding: the third party's claim can be maintained in court while the claims of the [*20]parties subject to an arbitration agreement, like Petitioners and Citibank here, can be maintained in arbitration. Petitioners offer no reason, compelling or otherwise, why this would be unsustainable.
4. CPLR § 5239's Venue Provision Does Not Preclude Arbitration of EIPA Claims
Finally, Petitioners contend that because CPLR § 5239 includes a provision requiring any proceeding pursuant to § 5239 to be brought "in the county where the property was levied upon, or in a court or county specified in [CPLR § 5221]," Petitioners' § 5239 claims must be adjudicated in a court. The Court, however, rejects this argument as meritless.
All that CPLR § 5239's venue provision means is that should a special proceeding be commenced in court, it must be commenced in the county mandated by the provision. It does not, as Petitioners contend, mean that a § 5239 special proceeding must always be brought in a court. As already determined, § 5239 does not create a nonwaivable right to initial adjudication in court. If that right is waived by agreement to arbitration, the venue provision is simply no longer applicable.
In summary, Petitioners' arguments concerning the text and "practical application" of CPLR §§ 5222-a, 5239, and 5240, independently or collectively, fail to convince the Court that the Legislature intended to preclude arbitration of judgment-debtors' EIPA claims against banks, such as Petitioners' claims against Citibank here.
* * ** * *
Because the Court has determined that neither Cruz nor the text or "practical application" of CPLR Article 52 precludes arbitration of Petitioners' EIPA claims against Citibank, there is no need to consider whether the FAA preempts, on federal supremacy grounds, any contrary portion of Article 52.
C. The Parties' Dispute Must be Arbitrated
A court deciding whether, under the FAA, all or part of an action should be sent to arbitration must determine, first, "whether the parties agreed to arbitrate" and, second, "the scope of the agreement." JLM Indus., Inc. v. Stolt-Nielsen SA, 387 F.3d 163, 169 (2d. Cir. 2004) (internal quotation marks and citation omitted). When deciding whether the parties agreed to arbitrate a particular matter, courts "apply ordinary state-law principles that govern the formation of contracts." First Options of Chi., Inc. v. Kaplan, 514 U.S. 938, 944 (1995); Meyer v. Uber Techs., Inc., 868 F.3d 66, 73-74 (2d Cir. 2017) ("[T]he district court must first determine whether such agreement exists between the parties. This question is determined by state contract law." (citation omitted)).
i. Petitioners Agreed to the Arbitration Agreements
Petitioners do not dispute, in any authorized portion of their filings, that they entered into the Arbitration Agreements.[FN9]
Indeed, they effectively concede the point: "Petitioners do not dispute that some of the agreements entered into by Petitioners with the Bank contain arbitration provisions." (Pets.' Mem. at 2) Therefore, the Court finds that Petitioners agreed to the Arbitration Agreements.
ii. The Question of the Arbitration Agreements' Unconscionability Must Be Determined By the Arbitrator
"Generally, '[w]hen the parties' contract delegates the arbitrability question to an arbitrator, a court may not override the contract [and] . . . possesses no power to decide the arbitrability issue.'" Newton v. LVMH Moet Hennessy Louis Vuitton Inc., 192 AD3d 540, 541 (1st Dep't 2021) (quoting Henry Schein, Inc. v. Archer & White Sales, Inc., 139 S. Ct. 524, 529 (2019)). Similarly, "[w]here there is a broad arbitration clause and the parties' agreement specifically incorporates by reference the AAA rules providing that the arbitration panel shall have the power to rule on its own jurisdiction, courts will leave the question of arbitrability to the arbitrators." Zachariou v. Manios, 68 AD3d 539, 539 (1st Dep't 2009) (internal quotation marks and citation omitted); see also Flintlock Const. Servs, LLC v. Weiss, 122 AD3d 51, 54 (1st Dep't 2014) ("Where parties agree that the AAA rules will govern, questions concerning the scope and validity of the arbitration agreement, including issues of arbitrability, are reserved for the arbitrators." (citation omitted)). "Arbitrability" includes whether an agreement is enforceable due to questions about its unconscionability. Wu, 78 Misc 3d at 577 n.6, 577-79. To delegate an arbitrability question to an arbitrator, there must be clear and unmistakable evidence that the parties agreed to do so. First Options, 514 U.S. at 944-45.
Here, the Arbitration Agreements contain a delegation provision. Specifically, the Arbitration Agreements provide that "[a]ny claim or dispute relating to or arising out of your [accounts], this Agreement, or our relationship will be subject to arbitration" and that "[d]isputes also include claims relating to the enforceability or interpretation of any of these arbitration provisions." (Haslam Aff. Ex. B at 39; id. Ex. D at 52; id. Ex. G at 5-6; id. Ex. H at 52) The plain language of this delegation provision clearly and unmistakably evinces the parties' intent to delegate to an arbitrator the responsibility for resolving the threshold issue of the Arbitration Agreements' enforceability, including the question of whether the agreements are unconscionable.
Additionally, the Arbitration Agreements expressly provide that the AAA's or JAMS's rules will govern the arbitration, depending on which forum is chosen. (Id. Ex. B at 40; id. Ex. D at 53; id. Ex. G at 6; id. Ex. H at 53) Both the AAA's Consumer Arbitration Rules and JAMS's Comprehensive Arbitration Rules and Procedures provide that the arbitrator may rule on his or her own jurisdiction. (Am. Arbitration Assoc., Consumer Arbitration Rules R-14; JAMS, Comprehensive Arbitration Rules & Procedures R. 11(b)) Further, the Arbitration Agreements contain a quintessentially broad arbitration clause, providing that "[a]ny claim or dispute relating to or arising out of your [accounts], this Agreement, or our relationship will be subject to arbitration." See Wu, 78 Misc 3d at 569-70 (citations omitted). Thus, under the applicable federal and state law, these provisions of the Arbitration Agreements further evidence the parties' intent to delegate the threshold issue of enforceability to an arbitrator and, in turn, disempower a court from deciding it.
Finally, although Petitioners challenge the enforceability of the Customer Manuals and the Arbitration Agreements, each as a whole, they do not specifically challenge the delegation provision. Thus, the threshold issue of the Arbitration Agreements' unconscionability must be arbitrated. Wu, 219 AD3d at 1209 ("Plaintiff's arguments disputing the validity of the terms and raising unconscionability must be decided by the arbitrator, because the terms contain a delegation provision that plaintiff did not specifically challenge." (citing Rent-A-Ctr., W., Inc. v. Jackson, 561 U.S 63, 72 (2010))).
i. The Parties' Dispute Falls Within the Scope of the Arbitration Agreements
Once again, Petitioners do not dispute that their EIPA claims against Citibank fall within the scope of the Arbitration Agreements. Nor could they. As determined, the Arbitration Agreements contain a broad arbitration clause. If nothing else, Petitioners' claims clearly relate to or arise out of their relationship with Citibank. Therefore, the Court finds that Petitioners' claims are within the scope of the Arbitration Agreements and, accordingly, that this dispute must be arbitrated.
V. Conclusion
All arguments considered, Petitioners have failed to demonstrate that, despite the strong federal and state policies favoring arbitration, a judgment-debtor's claims against a bank for violations of the EIPA may not be arbitrated. Cruz, the Court of Appeals decision on which Petitioners stake much of their position against arbitrability, simply cannot be interpreted as intending to bar, by implication, the arbitration of such EIPA claims. Nor are Petitioners' arguments based in the text and "practical application" of CPLR Article 52 any more convincing that arbitration is precluded.
By contrast, Citibank has established, and Petitioners have failed to refute via their authorized filings, that Citibank and Petitioners agreed to the Arbitration Agreements and that this dispute falls within the scope of those agreements. Accordingly, Citibank's motion to compel arbitration of Petitioners' EIPA claims in this proceeding must be and is granted. Petitioners' claims must, therefore, proceed to arbitration, on an individual basis, in conformance with the Arbitration Agreements.
As a consequence of Citibank's motion to compel arbitration being granted, Petitioners' separate motion to, among other things, certify classes is rendered moot and must be and is denied.
The Court has considered the additional contentions of the parties not specifically addressed herein. To the extent that any relief requested by the parties was not addressed by the Court, it is hereby denied.
Accordingly, it is hereby:
ORDERED that respondent CITIBANK, N.A.'s ("Citibank") motion (Seq. No. 2) seeking an order, pursuant to CPLR § 7503, compelling arbitration of the dispute between Citibank and petitioners CELINDA ACEVEDO and ANGELICA ACEVEDO (together, "Petitioners") is GRANTED; and it is further
ORDERED that Petitioners and Citibank shall, as soon as practicable, proceed to arbitration pursuant to the Arbitration Agreements (as defined above) on an individual basis; and it is further
ORDERED that Petitioners' motion (Seq. No. 1) seeking an order certifying proposed classes, finding that Citibank violated the Exempt Income Protection Act, and awarding Petitioners and the certified class members damages and injunctive relief is DENIED as moot; and it is further
ORDERED that the Clerk shall mark the motions (Seq. Nos. 1 & 2) decided in all court records; and it is further
ORDERED that the Clerk shall mark the proceeding disposed in all court records.
This constitutes the Decision, Order and Judgment of the Court.
Dated: March 25, 2024
HON. VERONICA G. HUMMEL, A.J.S.C.

Footnotes

Footnote 1:Citibank's affiant, Ms. Haslam, avers that "Citibank revises the [Client Manuals] from time to time" and that, "[a]t all relevant times, revised [Client Manuals] are and were available on demand at each Citibank financial center and on Citibank's website." (Haslam Aff. ¶ 5)

Footnote 2:NAF (now known simply as Forum) no longer provides consumer arbitration services pursuant to a 2009 consent decree with the Minnesota Attorney General. Minnesota v. Nat'l Arbitration Forum, NO. 27-CV-09-18550, 2009 Minn. Dist. LEXIS 340 (Minn. Dist. Ct. July 28, 2009).

Footnote 3:Because the Court ultimately concludes that responsibility for resolving this issue was delegated to the arbitrator, the Court does not recite Petitioners' or Citibank's specific arguments concerning the Arbitration Agreements' unconscionability. (See infra Part IV.C.ii)

Footnote 4:Justice Thompson presided over this proceeding in January 2022 but has since retired from the bench. Subsequent to Justice Thompson's retirement, this proceeding was reassigned to the undersigned.

It is due to the Interim Order that resolution of the pending motions has been delayed. When the Interim Order was issued, the motions were inadvertently marked as disposed in the Court's electronic case-management system. As soon as the undersigned became aware that the motions were not, in fact, resolved and properly disposed, the undersigned scheduled oral argument.

Footnote 5:Petitioners request, however, that the Court disregard Citibank's FAA preemption arguments because Citibank raised them for the first time in reply. (Pets.' Suppl. Mem. at 2-3) The Court declines that request, however, on multiple grounds. First, the Court finds that the arguments were properly raised in reply because they are responsive to Petitioners' arguments in its opposition. E.g., Tsadilas v. Providian Nat'l Bank, 13 AD3d 190, 192 (1st Dep't 2004). Second, Justice Thompson's Interim Order specifically granted Petitioners an opportunity to respond in full to Citibank's preemption arguments, and Petitioners have done so; therefore, consideration of those arguments would not prejudice Petitioners.

Footnote 6:Citibank did not provide the Court with any New York caselaw addressing whether inclusion of a choice-of-law provision in an arbitration agreement expressly electing the FAA as the governing law is, on its own, sufficient under New York law. Nor was the Court able to locate any such caselaw through its own research. Nevertheless, the Court finds the caselaw from other jurisdictions cited above to be persuasive on the issue. Just like California, New York recognizes that arbitration is a matter of contract. Wu v. Uber Techs., Inc., 78 Misc 3d 551, 567 (NY Sup. Ct. Bronx Cty. 2022), aff'd, 219 AD3d 1208 (1st Dep't 2023). Thus, the same reasoning employed by the California appellate court in Barrera, 313 Cal. Rptr. 3d at 187, to find that the FAA applied when the parties selected it in the applicable agreement—the same reasoning that appears to underpin the other jurisdictions' decisions as well—should apply with the same force here.

Footnote 7:Petitioners' counsel, the Law Offices of G. Oliver Koppell & Associates, was also counsel for the appellants in Cruz.

Footnote 8:Even if the Court is mistaken by excluding consideration of the three types of relief that Petitioners seek in the Verified Complaint because that relief would not be permitted under Cruz, Acevado I, and Acevado II, considering that relief would not change the Court's conclusion that arbitration is available. The broad scope of authority conferred on the arbitrator by the Arbitration Agreements and the applicable provider rules—i.e., to essentially award any relief available under law—comfortably embraces obey-the-law injunctions and damages for unlawful transfer of funds to judgment-creditors.
Nor would the Court's conclusion change if all of the relief available under CPLR §§ 5239 and 5240 were considered. Again, the Arbitration Agreements and applicable provider rules grant the arbitrator the power to award basically any relief available under law, and that certainly includes any relief available under CPLR §§ 5239 and 5240. That a party may need to confirm the award and convert it into a court order or judgment to enforce it is, for the reasons discussed supra Part IV.B.i.3, no reason to conclude that arbitration of claims seeking such relief are barred. The Court notes, again, that Petitioners' arguments to the contrary are stated in a conclusory manner—they say that such relief is beyond the scope of arbitral jurisdiction, without citing to any supporting text, statute, or caselaw, and simply expect the Court to accept it as fact.

Footnote 9:Petitioners have disputed the formation of the Arbitration Agreements in their sur-reply. But, as the Court previously discussed, that portion of the sur-reply, among others, was not authorized by Justice Thompson's January 19, 2022 Interim Order and will not be considered. (See supra Part III.B)